Teal vs. The State of Georgia.

22    75<br>
92    464<br>
22    75<br>
f 109  487

No. 18.—MESHACK TEAL, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] No irregularity in a criminal case, not affecting the real merits of the offence charged in the indictment, shall be good on a motion in arrest of judgment ; all other defects must be taken advantage of by plea, or in some other way, and at the proper time, pending the proceeding.

[2.] On the trial of a defendant for murder, it is the duty of the Court to give to the jury the definition of each grade of homicide, as regulated by the Penal Code, and also of justifiable homicide—provided the testimony will authorize it.   If

it be apparent, however, that the defendant is guilty of murder or voluntary manslaughter, or is not guilty, it is not error in the Court so to charge.

[3.] To justify homicide, the fears of the slayer should be those of a reasonable man—one reasonably courageous, reasonably self-possessed, and not those of a coward.

[4.] To support the plea of self-defence in a capital case, the accused must show that he took the life of the deceased to save his own. He must demonstrate that there was a necessity for the killing.

[5.] A new trial will not be granted upon the ground of newly discovered evidence, unless it is probable that if introduced it might change the verdict.

Indictment for Murder, from Campbell Superior Court. Tried before Judge HAMMOND, at September Term, 1856.

Meshack Teal was indicted for the murder of Robert Northcutt. The bill of exceptions sets forth, that upon the call of the case, the parties announced themselves ready for trial—a jury was empannelled, and the Solicitor General arraigned the defendant, who pleaded not guilty. The Solicitor General then read to the jury the indictment, and stated that it was founded upon a *special presentment* that he held in his hand.

The following witnesses were then sworn and examined on the part of the State :

*Mrs. Mary Northcutt* says : The transaction was in Campbell county, the 30th July, 1855, at the house of deceased, near sun set. The prisoner came up to the yard gate ; he had a rifle gun belonging to deceased, which he had borrowed. The deceased was sitting in a chair near the door ; witness was setting near him ; deceased was nursing a child out of doors. Prisoner spoke first, and said to deceased, " Bob come out here I want to talk to you." Deceased's name was Robert Northcutt. Prisoner spoke loud, and appeared to be angry. Deceased turned round and said to prisoner, " Shack Teal I want you to go away from here ;" prisoner replied, " Oh no, I want you to come out here ;" deceased was singing at the time prisoner came up ; after he

told prisoner to go away, he sung on for about a half a minute; deceased made no reply, but put down the child and walked about half way to where prisoner was standing and then walked back into the house and took down the gun. At the time deceased turned back into the house, prisoner said something which witness does not recollect. Deceased took down a shot-gun and walked out to the fence near where prisoner was standing; there was nothing but the fence between them; deceased laid the muzzle of his gun on the fence, tapping it but not pointing it in the direction of the prisoner. Deceased told prisoner he wanted him to leave there, to go away; prisoner told deceased to come outside the gate. Prisoner cursed and swore so much witness can't recollect what he did say. Witness went into the house to lay down the baby she was nursing; before she had time to get back again, she heard the report of the rifle; witness stayed in the house several minutes; when she came out she saw deceased some four or five steps outside of the gate, and had his gun raised, snapping it, in his right hand; witness asked him what he meant, or what he was doing; witness ran out of the house as soon as she heard the report of the gun; deceased told her that Teal had killed him; she asked him if he could get in the house without her assistance; he said he could very well. She don't think she saw Teal at the time she went out to where her husband was. She then went on without turning back, to Mr. Cook's, who lived about a half a mile off; she overtook prisoner a hundred and fifty or two hundred yards from the house; prisoner was walking in a common gait towards Mr. Cook's when she first saw him; when she got near him, he broke into a run, and run twenty or thirty yards, and then turned round far enough to see witness, and then stopped and turned into a walk. She was running as fast as she could. As she passed prisoner she told him that he had killed Mr. Northcutt; he said he expected he had, that he had shot him, and he expected he had killed him.

This was on Monday; deceased lived until some minutes after one o'clock the next day. The ball did not pass through. She saw prisoner that (Monday) morning; he came up to deceased's house and told deceased he wanted him to go squirrel hunting with him that morning; he stayed an hour or two, may be three. Deceased told him he could not go, that he didn't feel well able. Prisoner asked him three or four times to go squirrel hunting; he insisted on his going. Deceased said he would likely feel better in the evening, and if he did he would go with him. Prisoner said he would be back in the evening. Deceased was very sick; he set up a part of the time and was in bed a part of the time in the morning; he did not leave home that day; remained at home until after the children came home from school. The children who came home were Robert Warren Northcutt, Joseph A. Northcutt, (witness sworn in the case,) and Mrs. Strickland's children. Deceased went down to the plantation gate, as she supposes; he only staid a few minutes; when he came back he took up his little daughter and set down in the yard and went to singing; witness don't think it was more than thirty minutes after he commenced singing before Teal, the prisoner came. This was the same time that witness spoke of in the first part of her examination. All this took place in this county.

*Cross Examined:* Lives at the same place she did at the time Mr. Northcutt was killed, about five miles from Campbellton, and one or two hundred yards from where prisoner lived; prisoner was living on deceased's land; lived on the other side from Campbellton, of deceased's house; he usually passed their house coming to town. Prisoner and deceased appeared friendly on Monday morning; they talked friendly and parted friendly; deceased did not go to Emanuel Teal's mill on Monday. The first remark prisoner made when he came up in the evening was, " Bob come out here, I want to talk to you;" deceased replied, " Shack Teal I want you to go away from here."

*Joseph A. Northcutt* says, that he saw prisoner in the cotton patch on Saturday before his (witness's) father was killed on Monday. The cotton patch belonged to his father and prisoner. That Warren Northcutt, William Strickland, William Latham and other little boys were with him; they were picking up apples and beating cider; he went down to a little apple tree, close to where prisoner was at work to pick up apples. Witness rode Mr. Latham's horse through the corn; prisoner said he would be damned if the horse should go back the same way; witness said if his pa was there he would go back and not ask him. Prisoner said he would make witness and pa, and all the rest of us suffer before Monday night; he spoke like he was not satisfied about it; and witness told him that they were going to start to school through there Monday morning; prisoner said he would be damned if they should. As witness came from school Monday evening, the gate was *withed* up. John Strickland, Warren Northcutt, and two little girls were along; witness and the others climbed the fence; his pa went down to the gate and cut it loose, and he and Warren went with him; after his father cut the gate loose he went back to the house, and he and Warren went back with him; his father sat down; did not see prisoner while they were gone. About a quarter of an hour after we got back saw prisoner coming up the road; it was about sun down. Prisoner had his father's gun when he came; he said when he first came up, "come out here Bob, I want to talk to you;" his father replied, "go off from here Shack Teal;" prisoner replied, "no, come out here any how;" his father started and went half way, and told him he was a grand rascal, and did'nt want to have any difficulty with him. Prisoner told him he was a damned liar; his father turned round and went back into the house, and got his gun and went to where prisoner was, and rattled his gun on the fence, and told prisoner to go off from there; "no," prisoner said, "come out here;" his father went out and prisoner walked off pretty fast some distance, and said

" damn you, I am a great mind to shoot you, any how," and raised his gun and shot him.   When his father went out he stopped and fastened the gate, and walked five or six steps in the direction that prisoner went; prisoner went thirty-eight or forty steps and stopped, and turned round and said damn you, I'll blow a ball through you, and shot at him. Witness was in the yard when the gun fired; his father held his gun down in his hand, and after the gun fired he raised his gun and snapped once or twice at prisoner; thinks he snapped two or three times; his father made no attempt to shoot before prisoner shot; prisoner would have had to go fifty or sixty yards up the road to get out of sight of witness. Prisoner went towards town.

*Cross Examined*: Prisoner was hoeing cotton when he went to the field on Saturday; he was not in the same field that witness went to; prisoner worked the corn; he rented the land from witness's father, the deceased; the horse bit a nubbin in going through the field, was the reason why prisoner did not want him to go back the same way.   William Latham asked prisoner for a muzzle to put on the horse; prisoner lent him the muzzle, and he took the horse back the same way which he came.   They had carried horses through the field frequently before.   Witness has known his mother and others to ride through the field.   He did not tell Emanuel Teal and Wiley Steed, three days after his father was killed, at Teal's mill, that he went into the house after the gun; and he did not tell Wiley Steed, three days after his father was killed, at the shop at Petersburg, that he, witness, went into the house after the gun.   When his father went to the gate, witness saw his mother just entering the door to come out; just as his mother came out of the house the rifle fired, and she went straight on to Cook's; did not stop with the deceased.   When the rifle fired Warren Northcutt was standing near deceased—much nearer than witness was.

*Doctor Thomas C. Glover* says, he went to see deceased on the night of the 30th July, 1855; he found a gun-shot wound

Teal vs. The State of Georgia.

on the abdomen, 2½ inches below the navel, and 2½ inches from the middle-line, and cut out that ball near the spinal column. He was of opinion that the intestines were perforated, and that deceased must consequently die, and told him so. Deceased died the next day. Witness made a *post mortem* examination the following morning; found the small intestines perforated, mesentery blood vessels lacerated, and it is his opinion that the wound produced the death of the deceased. He met prisoner in town, after he was called to see deceased; asked him if he had shot deceased, prisoner said he had; asked him what he shot him with: he said with a rifle; asked him how many balls: he said only one; asked him how far he was from him: he said thirty or forty yards. Witness is a practicing physician.

*Zadock Jennings,* for the prisoner, sworn, says that he heard the conversation between Dr. Glover and prisoner; saw prisoner in town the night after he had shot Northcutt. Prisoner went to Samuel Lewis and offered himself up to Lewis, and told him that he had shot Northcutt, and expected he had killed him, and he had come to town to deliver himself up, and wanted him, the Sheriff, to go back to town with him.

Here the testimony closed, and after argument by counsel and the charge of the Court, the jury retired and returned a verdict of guilty. The jury was polled, and each acknowledged the verdict to be his, after which they dispersed.

The day after, defendant's counsel made a motion for a new trial, on the following grounds:

1st. Because the verdict was contrary to law.

2d. Because the verdict was contrary to the evidence, and circumstances attending it, and the weight of evidence.

3d. Because the special presentment on which the indictment was founded, was not entered on the minutes of the Court.

VOL. XXII 6.

4th. Because the special presentment was not introduced or read on the trial.

5th. Because the Court erred in permitting the special presentment to go before the jury, it never having been read as evidence.

6th. Because the Court did not read or explain to the jury, the different grades of manslaughter.

7th. Because the Court erred in refusing to charge the jury as requested, as follows:

First: That when an indictment is made out on a presentment, it is incumbent on the State to prove the presentment.

Second: That it is incumbent on the State to prove that the presentment is made out according to the Constitution and laws.

Third: That on the trial of an indictment founded on a special presentment, it is necessary for the State to introduce the presentment as evidece, and on failure to do so, the case is not made out.

8th. Because the Court refused to charge, as requested, that if a man, though in no great danger of serious bodily harm, through fear, alarm, or cowardice, kill another, under the impression that great bodily injury is about to be inflicted upon him, it is neither manslaughter, nor murder, but self-defence.

9th. Because the Court erred in permitting the presentment to go before the jury, on the trial, without being tendered to defendant's counsel, and thereby depriving them of an opportunity to except to the variance in the name of a grand juror, in the presentment and bill—the name of Evan R. Whitley appearing in the bill, and that of Evan R. Whiley in the presentment.

10th. Because the defendant, since the trial, has discovered that he can prove by T. C. Glover that deceased struck at prisoner with the gun, before prisoner shot him.

11th. Because it appears that William M. McClung was

sworn as a juror, and that William W. McClung returned. the verdict into Court—there being but one McClung.

The Court overruled the motion, and refused to grant a new trial, and counsel for prisoner excepts.

LIGON & WRIGHT, for plaintiff in error.

Sol. Gen. FIELDER, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

We shall not undertake to notice each specification in the motion for a new trial, but group them together for the sake of brevity.

[1.] And to all the errors complained of, as it respects the special presentment, and the misnomer of the grand and traverse jurors, we make this general reply, that those irregularities which occured before the arraignment, should have been specially pleaded : and secondly, that no motion in arrest of judgment shall be sustained, for any matter not affecting the real merits of the offence charged in the indictment. (*Cobb*, 833.) Under this provision of the Code, we held, that the failure to read the indictment to the jury was not good in arrest of judgment, (*Wright vs. The State*, 18, *Ga. Rep.*, 383.)

[2.] Error is assigned because the Court did not charge the jury as to involuntary manslaughter. Is there a particle of proof to authorize such a charge? In *Davis vs. The State*, 10, *Ga. Rep.*, 101, citing the previous case of *Holder vs. the State*, 5, *Ga. Rep.* 441, this Court did say, that "*in view of the facts disclosed by the record*," the Court below ought to have given to the jury the definition of murder, voluntary manslaughter, and the two grades of involuntary manslaughter, and also the definition of justifiable homicide; and left it to them to find under which definition it fell; and not to

have instructed the jury that they must find the defendant guilty of murder, voluntary manslaughter, or not guilty.

Could we say the same thing here—in view of the facts disclosed in this record? Have counsel in all their commendable zeal pointed out a scintilla of evidence which would reduce this killing to *involuntary* manslaughter? Did the prisoner in any of his confessions intimate any circumstance which should justify such a supposition?. Did he say to the widowed wife, who, when she overtook him on the road, told him that he had killed her husband, that the shot was accidental, or that he did not intend to take his life, but to cripple him? Nothing of the kind.

It was then, as the Court stated, either murder, or voluntary manslaughter, or justifiable homicide. And so the jury were obliged to find. And such was the ruling of this Court in *Boyd vs. the State*, 17. *Ga. Rep.* 193.

Counsel insist, that inasmuch as any grade of homicide may be found under any indictment for murder, that it is the duty of the Court to charge on each, as each is necessarily put in issue by the pleadings. We demur to this proposition ; and on the contrary, hold that the charge should apply to the case made by the pleadings and the *proof*. And that in just such a case as this, to charge the jury as to the crime of involuntary manslaughter, would have been as inapplicable to the case, as to have instructed them as to the law of arson or robbery.

[3.] Was the Court right in refusing to give the written charge requested by defendant's counsel? The request was that the fears of a coward would justify homicide. The Penal Code says, the fears of a reasonable man; reasonably courageous—reasonably self-possessed.

[4.] Was the verdict of guilty not only contrary to the evidence, but strongly and decidedly so? We think it was in accordance with the testimony, and the weight thereof. What other verdict could the jury have found upon the facts? There was no necessity for the killing. Teal himself, did

Teal vs. The State of Georgia.

not pretend to Mrs. Northcutt, Dr. Glover and others, that there was—that he shot in self-defence; that he took the life of Northcutt to save his own. The proof shows that the very opposite of all this was true. That revenge had taken possession of the heart of this misguided man; and that to gratify it, he wantonly and wickedly murdered his neighbor in the presence of his family.

[5.] Ought a new trial to have been granted on account of the newly discovered evidence? Dr. Glover would swear that the deceased told him that he struck at Teal with his gun across the fence. But this was sometime before the consummation of the tragedy. Northcutt had not then gone outside of his inclosure. The accused had walked off some thirty or forty steps; and turning, said, "damn you, I am a great mind to shoot you, any how, or blow a ball through you." And the act accompanied the threat. Let it be remembered, too, that Dr. Glover states, that Northcutt said to him, at the same time, that at the time he was shot, he was offering no violence to Teal; neither had he attempted any, except that of striking at him across the fence, as already noticed.

We do not see that this proof could, by any possibility, change or modify the verdict of the jury. It ought not.

Upon any view of the case, we are constrained to affirm the judgment of the Circuit Court, overruling the motion for a new trial.

We sincerely pity this wretched man. But the law must be vindicated. Human life, the most sacred of God's gifts, must be protected.

Judgment affirmed.